# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge Christine M. Arguello

Civil Action No. 17-cv-00022-CMA-KMT

MICHAEL SCOTT SMITH,

    Plaintiff,

v.

CHEYENNE MOUNTAIN SCHOOL DISTRICT 12,

    Defendant.

---

## ORDER REJECTING THE RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE KATHLEEN M. TAFOYA AND AFFIRMING THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

---

This matter is before the Court on the Recommendation of United States Magistrate Judge Kathleen M. Tafoya (Doc. # 45), wherein she recommends that this Court reverse and remand the administrative decision of Administrative Law Judge (ALJ) Tanya Light, which was appealed by Plaintiff Michael Scott Smith on behalf of his minor son, R.S. Defendant Cheyenne Mountain School District 12 timely filed objections to the Recommendation, essentially challenging it in its entirety. (Doc. # 46.) The Court must therefore review the issues de novo and, in so doing, "may accept, reject, or modify the recommended disposition[.]" Fed. R. Civ. P. 72(b)(3). The Court need not consider, however, any arguments raised for the first time in objections, as they are deemed waived. *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996). Having conducted the required de novo review, the Court rejects the Recommendation and affirms the decision of the ALJ.

1

## I. BACKGROUND

Magistrate Judge Tafoya's Recommendation provides an extensive recitation of the complex factual and procedural background in this case. The Recommendation is incorporated herein by reference. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Accordingly, the factual background of this dispute will be reiterated only to the extent necessary to address Defendant's Objections.

This cases arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*. Specifically, in March 2016, Plaintiff and R.S.'s mother, Ramona Smith, lodged a due process complaint alleging that Defendant violated 20 U.S.C. §§ 1400–82 and the Colorado Exceptional Children's Educational Act ("ECEA"), 1 CCR 301-8, by failing to provide R.S. with a free and appropriate public education ("FAPE") when it denied him enrollment Cheyenne Mountain Charter Academy ("CMCA")[1]. After a hearing on the issue, the ALJ agreed, and on October 3, 2016, she issued a final agency decision, finding that R.S. was denied a FAPE, from at least August 13, 2014 through October 16, 2014. With respect to the relief that should flow from that liability, the ALJ ordered:

> Respondent shall re-test [R.S.]'s early literacy skills through the [Dynamic Indicator of Basic Early Literacy Skills] DIBELS test, or a test of Respondent's choosing that assesses the same or similar early literacy skills as the DIBELS test if Respondent believes the DIBELS test is no longer appropriate due to the passage of time. If [R.S.]'s scores are below benchmark levels, Respondent, in coordination with the IEP team, shall decide what compensatory services are necessary in order to improve [R.S.]'s scores up to benchmark levels and will implement those services

---

[1] CMCA now goes by the name The Vanguard School ("Vanguard"). CMCA and Vanguard are used interchangeably throughout the ALJ's decision.

2

> accordingly. If [R.S.]'s scores are at benchmark levels, then nothing more is required of the District.

(Doc. # 45-1 at 10.) Defendant filed a Motion for Clarification of the October 3, 2016 Order, noting that R.S. had already taken several DIBELS tests since October 2014 and had received scores above benchmark levels on those assessments. (Doc. # 27 at 666–76.) In light of that Motion for Clarification and R.S.'s DIBELS scores, ALJ Light issued a subsequent Order wherein she concluded that Defendant had "complied with the October 3, 2016 Final Agency Decision with respect to any additional testing" and, thus, "[n]othing further is required of [Defendant]." (Doc. # 45-1 at 12.)

Plaintiff then initiated this case, challenging the ALJ's October 3, 2016 decision and the subsequent October 27, 2016 order that flowed from it. As astutely phrased by Magistrate Judge Tafoya, the main issues before the Court are:

1. Whether the ALJ erred when she allowed Defendant to determine the extent of the harm it caused when it violated R.S.'s right to a FAPE, and to then determine the remedy for its own violation.

2. Whether the ALJ erred when she held that compensatory education was unavailable as a remedy in the absence of educational regression.

3. Whether the ALJ erred when she peremptorily eliminated private school placement as a potential remedy.

Wedded to the third issue is Defendant's affirmative defense—whether res judicata bars this Court from adjudicating the issue of private school placement based on a preliminary injunction issued by Judge Brimmer in an earlier case and affirmed by the Tenth Circuit.

Defendant objects to the ALJ's recommended conclusion on each issue; the Court therefore addresses them in turn.

## II. STANDARD OF REVIEW

By statute, Congress has set out rather unique rules governing the review of liability in IDEA claims. Unlike the deferential review typically afforded to administrative adjudication of statutory claims, Congress requires district courts to apply a modified de novo standard when reviewing agency disposition in the IDEA context. See 20 U.S.C. § 1415(i)(2)(C); *Murray v. Montrose County Sch. Dist.*, 51 F.3d 921, 927 (10th Cir.1995). Specifically, the district court must (1) receive the record of the administrative proceedings, (2) hear additional evidence at the request of a party[2], and (3) base its decision on the preponderance of evidence. 20 U.S.C. § 1415(i)(2)(C). At the same time, although the statute specifies that review is de novo, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that "due weight" must be given to the administrative proceedings, *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982), and the fact findings of which are "considered prima facie correct," *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).

## III. ISSUE ONE—DELEGATION OF AUTHORITY

As mentioned, the crux of the first issue before the Court is whether the ALJ wrongly delegated to Defendant her authority to fashion the R.S.'s relief for Defendant's FAPE denial. Magistrate Judge Tafoya concluded that she did so err. Considering the specific circumstances of this case, the Court disagrees, finding no error and thereby sustaining Defendant's Objection to Magistrate Judge Tafoya's Recommendation.

---

[2] Neither party has sought the reopening of further evidence in this case.

Case law is clear: the ALJ "may not delegate his authority to a group that includes an individual specifically barred from performing [her] functions." *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 526 (D.C. Cir. 2005); *M.S. ex rel. J.S. v. Utah Schools for Deaf and Blind*, 822 F.3d 1128 (10th Cir. 2016) (adopting *Reid* "as our own."). Defendant school district and its employees plainly constitute individuals "barred from performing the [ALJ's] functions." *See Reid*, 401 F.3d at 526. Indeed, barred individuals include any "employee of the State educational agency or the local educational agency involved in the education or care of the child; or a person having a personal or professional interest that conflicts with the person's objectivity in the hearing." 20 U.S.C. § 1415(3)(A).

In this case however, the ALJ did not "delegate" her authority to Defendant to fashion R.S.'s relief. Having found R.S. to be performing at high levels in all areas but literacy, the ALJ determined that R.S.'s relief would be based on his performance on literacy tests—if he performed well, no further action would be required; if not, services would be necessary to remedy his educational regression. (Doc. # 45-1 at 10.) The ALJ therefore specifically ordered Defendant to "re-test [R.S.'s] early literacy skills through the DIBELS test. . . ." (*Id.*) The Defendant then provided the ALJ with R.S.'s DIBELS test results showing that R.S. had reached benchmark levels, and the ALJ consequently determined that R.S. was not entitled to further relief.

Magistrate Judge Tafoya nonetheless concluded that the ALJ improperly delegated her authority because she (1) allowed Defendant to use a different literacy test if Defendant found the DIBELS test outdated, and (2) ordered that the Defendant and IEP team could fashion further relief for R.S. if he performed poorly on the literacy

5

test. The Court agrees that these two portions of the ALJ's October 3 Order, had they materialized, would constitute an erroneous delegation of power under *M.S.*, 822 F.3d 1128 and *Reid*, 401 F.3d 516. But they did not materialize. Instead, in the ALJ's October 27 Order clarifying the October 3 Order, the ALJ approved the Defendant's use of the DIBELS test (as the ALJ had previously ordered), reviewed those test results, impliedly found R.S. to be performing at benchmark levels, and ordered that nothing further was required of Defendant. Neither Defendant nor the IEP team exercised any discretion over that relief. Neither "perform[ed] the [ALJ's] functions," nor did they exert "undue influence on the . . . decision." *M.S.*, 822 F.3d at 1135.

Accordingly, the Court concludes that there was no wrongful delegation in this case, thereby rejecting the Recommendation of Magistrate Judge Tafoya on this issue. To conclude otherwise—that portions in the ALJ's October 3 decision, which were rendered obsolete by the ALJ's October 27 Order, support a reversal and remand— would nullify the October 27 Order and waste valuable time and resources.

## IV. ISSUE TWO—COMPENSATORY EDUCATION

Issue two deals with the relief ultimately fashioned by the ALJ, which, as mentioned, resulted in no compensatory services being provided to R.S. because his DIBELS test scores demonstrated no educational regression. Magistrate Judge Tafoya did not address this issue—finding it "so entwined with the first that they travel together" on remand. Because this Court, however, has found no error on the first issue, the Court addresses the merits of the second, ultimately finding that, again, the ALJ did not err.

### A. COMPENSATORY EDUCATION LAW

Under the theory of "compensatory education," courts and hearing officers may award "educational services . . . to be provided prospectively to compensate for a past deficient program," including a denial of FAPE. *Meza v. Bd. of Educ. of the Portales Mun. Sch.*, No. CIV.10-0963-JB/WPL, 2011 WL 1128876, at *13 (D.N.M. Feb. 25, 2011).

An award of compensatory education is an "equitable remedy" that depends on "equitable considerations." *Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 15–16 (1993); *School Comm. of Burlington v. Department of Ed. of Mass.*, 471 U.S. 359, 374 (1985). "The essence of equity jurisdiction" is "to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Thus, the inquiry must be fact-specific and designed to ensure that the student is appropriately educated within the meaning of the IDEA. *Reid*, 401 F.3d at 524. It must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Id*. As the Fourth Circuit has explained, "[c]ompensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." *G ex rel. RG v. Fort Bragg Dependent Sch.*, 343 F.3d 295, 309 (4th Cir. 2003).

Fashioning the appropriate compensatory educational services is a profound discretionary responsibility, and the child is entitled to be made whole with nothing less than a complete remedy. *E.g.*, *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601,

7

625 (3d Cir. 2015); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 244–455 (2009).  To achieve that goal, courts and hearing officers may award compensatory education "to whatever extent necessary to make up for the child's lost progress" and to restore the child to the educational path he would have traveled but for the deprivation. *G.L.*, 802 F.3d at 625; *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 496 (3d Cir. 2012).

### B. ANALYSIS

Plaintiff argues that R.S. is entitled to compensatory education that "covers a period equal to at least the five months he was denied a FAPE, and however much longer it takes to restore him to his prior levels of academic performance (when he consistently performed at an E-grade level within the highest achievement groups at [CMCA])."  (Doc. # 30 at 11.)  The Court disagrees that compensatory services are warranted in this case.

To begin, the ALJ did not find a five-month FAPE denial; she found a two-month FAPE denial.  It appears that Plaintiff is attempting to include the summer months into his compensatory services request, but there is no evidence or testimony supporting that he would have gone to school or received educational services during those months; they are, therefore, inapplicable.

With respect to Plaintiff's educational regression due to the two-month FAPE denial, the Court finds that the ALJ's decision to deny compensatory services, based in part on R.S.'s grade level DIBELS test performance, was not erroneous.  The evidence before the Court suggests that R.S. experienced some educational regression between spring 2014 and mid-October 2014, when he returned to school and started first grade.

8

However, the school district's director of special education, Karen Higgins—who the ALJ found to be credible—testified that "it is not uncommon for students with disabilities . . . [and] students that don't have disabilities to see a decrease [in their academic performance] over the summer break." (Doc. # 27 at 814.)

Moreover, R.S.'s grades in most subject areas improved as soon as he returned to school. The following chart reflects that he was performing the same or better in all subject areas except history and math.[3]

| Subject | Kinder-Last Term Grade | First Grade-Second Term Grade | Trend |
|---|---|---|---|
| Citizenship: | Two 2+s and two 2-s | Four 3's | Higher |
| History: | 2 | U | Lower |
| Math Grade and Level: | E- and at grade level | G and below grade level | Lower |
| Poetry: | 2 | E | Higher |
| Phonics: | 3 and at grade level | 3 and at grade level | Same |
| Reading Grade and Level: | E- and at grade level | E- and at grade level | Same |
| Spelling Grade and Grade Level: | E- and at grade level | E and at grade level | Higher |
| Work and study habits: | 2's and 3's | All 3's | Higher |

(Doc. ## 41-5 at 5; 27 at 627–30.) In history, R.S.'s grades improved to an N after the second term of first grade, and his math scores increased to an E- and "at grade level" in the third and fourth terms. (*Id.*)

Testimony from R.S.'s general education teacher, Elizabeth Wilson—testimony that the ALJ found credible—substantiated this improvement. Ms. Wilson testified that she could not tell that R.S. had not been in school for two months, nor did she "notice that he was significantly behind." (Doc. # 27 at 959–61.) She considered his performance to be "just like every other student." (*Id.* at 961.) Ms. Wilson also testified

---

[3] CMCA's grading system utilizes "E, G, N, and U" for grades, and "3+, 3, 3-, 2+, 2, 2-, 1+, 1, and 1-" for "standards." Some subjects receive letter grades and some receive numbered standards. The letter grades have the following equivalents: E=A; G=B; N=C; and U=D. The numbered standards have the following equivalents: 3 = excellent; 2 = Satisfactory; and 1 = Needs Improvement. (Doc. # 41-5 at 5.)

9

that, by the end of first grade, R.S. was "at or above grade level" in reading, math, and spelling, and she had no concerns about recommending that he advance to second grade. (*Id.*) She specifically stated "[h]e would definitely advance to the second grade. There was nothing holding him back to repeat first grade." (*Id.*) The ALJ also found her testimony to be credible, and this Court gives that finding due weight.

With respect to R.S.'s DIBELS scores, the Court again notes some regression between spring 2014 and October 2014, as did the ALJ. Specifically, R.S.'s end-of-year kindergarten DIBELS scores were as follows:

> LNF (letter name fluency): 25 (no benchmark)
> PSF (phoneme segmentation fluency): 44 (benchmark = 40)
> NWF (nonsense word fluency)–CLS (correct letter sounds): 70 (benchmark = 28)

R.S.'s October 27, 2014, DIBELS scores substantially decreased:

> LNF: 20 (decreased by 5)
> PSF: 13 (decreased by 31)
> NWF–CLS: 33 (decreased by 37)

However, R.S. was tested again eight days later and his scores improved:

> PSF: 40
> NWF–CLS: 37
> LNF (not tested)

(Doc. # 27 at 580–600.) The ALJ nonetheless noted that R.S.'s NWF–CLS score, which remained 33 points below his spring 2014 score, demonstrated that he "suffer[ed] regression in his early literacy skills" due to his two-month absence. (Doc. # 41-5 at 9–10.) The ALJ also cited to Ms. Higgins' testimony that she would have expected R.S.'s DIBELS scores to have improved had he not missed any school.[4] (*Id.*) The ALJ,

---

[4] Of note, during this same answer to Plaintiff's question about R.S.'s improvement, Ms. Higgins highlighted the substantial improvement that R.S. made in just nine days of school, indicating that, although two months may have paused his growth, she certainly did not believe that to be a lasting pause, as Plaintiff suggests. (Doc. # 27 at 842.)

therefore, found "it is appropriate to grant [R.S.] equitable relief in order to address his regression as evidenced by his DIBELS scores and to place his early literacy skills back to where they would have been prior to the FAPE denial." (*Id.* at 10.) The ALJ then ordered R.S. re-tested to determine what specific compensatory services would be necessary to remedy that regression. (*Id.*)

As mentioned, the District thereafter submitted additional DIBELS testing reflecting R.S.'s increased NWF–CLS scores throughout his first grade year and into second grade, ultimately surpassing his kindergarten performance at a normal, if not advanced, rate. (Doc. # 34.) The tests specifically demonstrated an increase to 48 (benchmark 43) by middle of the year and to 101 (benchmark 58) by the end of the year. (*Id.* at 9.) This growth was further evidenced by R.S.'s literacy performance at the beginning of second grade when he scored a 118 (benchmark 54) on the NWF–CLS test. (*Id.* at 11.) The ALJ found these tests, in addition to the evidence set forth above, demonstrative of no lasting educational deficit as a result of R.S.'s two-month absence and therefore no need for compensatory services to cure any deficit. This Court, upon de novo review, agrees.

Indeed, there is no evidence or testimony showing any documented concerns from R.S.'s IEP team that he was in need of compensatory services to remedy any educational deficits related to his two-month absence. Plaintiff has provided no evidence or testimony from any of R.S.'s teachers supporting any lasting educational regression as a result of his two-month absence. Nor has Plaintiff challenged the validity of the evidence or testimony supplied by Defendant demonstrating R.S.'s

11

educational improvement almost immediately after returning to school.[5]  Moreover, although requesting compensatory services, Plaintiff provides this Court with no argument or information with respect to what those services might be or how they would make R.S. whole, considering that he has been performing at or above grade level in all subject areas since returning to school.

      Plaintiff instead appears to be arguing that compensatory services should be awarded to him automatically, regardless of his educational performance.  In support, Plaintiff relies heavily on *Boose v. D.C.*, 786 F.3d 1054, 1058 (D.C. Cir. 2015).  The *Boose* decision, however, does not stand for that proposition.  In *Boose*, a hearing officer found that the school district had denied FAPE to a child by not timely offering him an IEP during kindergarten.  *Id.* at 1057.  Before the district court could issue a decision on the appropriate remedy in the case, the school district evaluated the child and developed an IEP for him.  *Id*.  Because the school district had developed this IEP, the district court found that plaintiff's request for compensatory services was moot and declined to address the issue.  *Id.*  On appeal, the D.C. Circuit court disagreed that the request was mooted by the IEP because the IEP was developed in response to plaintiff's request for an IEP evaluation, not plaintiff's request for compensatory services.  In so doing, the *Boose* court did not render any findings or conclusions on the merits of the plaintiff's request for compensatory services; it merely remanded the case for the district court "to consider [the student's] eligibility for compensatory education." There is no indication from *Boose* that compensatory services would, or should, automatically be awarded.

---

[5] Of note, R.S.'s parents did not raise their concerns of educational regression until March 2016, nearly one and half years after R.S. returned to school.

Unlike in *Boose*, the ALJ in this case did assess the merits of R.S.'s entitlement to compensatory services. The ALJ, and this Court, thoroughly reviewed the evidence presented and determined that R.S.'s successful performance in school immediately following his two-month absence renders compensatory education unnecessary and unwarranted.

As set forth above, IDEA jurisprudence clearly ties a discretionary award of compensatory education to a child's educational "deficit." *Reid*, 41 F.3d at 524. In other words, a child must have "lost progress" or a need for education "restor[ation]," *G.L.*, 802 F.3d at 625, or else the child may be deemed "whole" and no educational services may be necessary. Indeed, the entire purpose underlying the IDEA is remedial and compensatory education "is meant to make up for prior deficiencies." *Reid*, 41 F.3d at 522–23; *Forest Grove*, 557 U.S. at 244. Having thoroughly reviewed the relevant law, briefing, and evidence in this case, the Court finds that the ALJ did not err in declining to award compensatory educational services because the evidence supports a finding of no lost progress or educational deficiencies. The ALJ's decision on this issue is, therefore, affirmed.

### V. ISSUE THREE—PRIVATE SCHOOL PLACEMENT AND RES JUDICATA

The final issue before the Court concerns whether the ALJ erred when it summarily denied the possibility of private school placement as a remedy. Defendant asserts that the issue of R.S.'s eligibility for private school funding is barred by the doctrine of res judicata because it was addressed and denied in an earlier case. Before addressing the merits of this dispute, the Court sets forth additional background information related to this issue.

## A. BACKGROUND

On May 22, 2014, nearly two years before commencing the instant litigation, R.S. was denied re-enrollment at CMCA. On July 16, 2014, R.S.'s parents filed a civil rights complaint against Defendant alleging four IDEA violations (the "2014 litigation"). Before the ALJ issued its final agency decision in that case, R.S.'s parents filed a motion for a preliminary injunction seeking an order directing, in part, Defendant to fund private school placement for R.S. during the pendency of the administrative proceedings. The ALJ denied the request, and R.S.'s mother appealed.

On October 17, 2014, a federal district court affirmed the ALJ's decision denying an injunction requiring private school placement but granted alternative relief by enforcing IDEA's "stay-put" provision, 20 U.S.C. § 1415(j), and requiring Defendant to enroll R.S. into CMCA. *Smith v. Cheyenne Mountain Sch. Dist. 12*, No. 14-02651-PAB-CBS, 2014 WL 5315033, at *1 (D. Colo. Oct. 17, 2014) (construing R.S.'s mothers' request for injunctive relief "as an appeal of the ALJ's adverse ruling on the stay-put issue"). CMCA therefore enrolled R.S. on October 17, 2014.

On March 10, 2016, R.S.'s parents initiated the instant litigation, seeking, among other requests already discussed, private school placement at Defendant's expense. (Doc. # 27 at 2–3.) The ALJ summarily denied R.S.'s parents' request for private school placement, concluding "the issue of private school tuition for R.S. is on appeal to the 10th Circuit Court of Appeals . . . and will not be considered in this case." (*Id.* at 392.) Since that denial, the Tenth Circuit has affirmed the district court's denial of R.S.'s parents' request for a "preliminary injunction requiring the School District to maintain

R.S.'s educational placement . . . [or fund] private school." *Smith v. Cheyenne Mountain Sch. Dist. 12*, 652 F. App'x 697, 701 (10th Cir. 2016).

**B. LAW**

A claim is barred under res judicata if four elements are met: (1) a final judgment on the merits in the prior suit; (2) the prior suit involved the same parties or their privies; (3) identity of the cause of action in both suits; and (4) a full and fair opportunity to litigate the claim in the prior suit. *Plotner v. AT & T Corp.*, 224 F.3d 1161, 1168 (10th Cir.2000); *King v. Union Oil Co. of Calilf.*, 117 F.3d 443, 445 (10th Cir. 1997). Stated differently, "[r]es judicata, or claim preclusion, precludes a party or its privies from relitigating issues that were or could have been raised in an earlier action, provided that the earlier action proceeded to a final judgment on the merits." *King*, 117 F.3d at 445.

**C. ANALYSIS**

In her Recommendation, Magistrate Judge Tafoya concluded that res judicata did not apply to bar Plaintiff's request for a remedy of private school placement in this case. She reasoned that R.S.'s parents' request for private school placement in the 2014 litigation was raised in the context of a preliminary injunction and there was not, therefore, a final judgment on the merits.

This Court agrees that res judicata does not apply here. The 2014 litigation dealt with the appropriate placement for R.S. during the pendency of those proceedings. The question of the child's placement during the pendency of administrative proceedings is procedural; it is not a determination on the merits of the case or the remedy warranted. *Tina M. v. St. Tammany Par. Sch. Bd.*, 816 F.3d 57, 60 (5th Cir. 2016) (when determining a child's educational placement during proceedings, "there is no merits

component"). Nor does it even require the normal showing of likely success on the merits, as do preliminary injunctions in other contexts. *Id.* at 60–61. The assessment is little more than a "procedural safeguard." *See, e.g.*, *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1037 (9th Cir. 2009); *see also Watrous v. District Court of the United States for the District of Colorado*, 207 F.2d 50, 58 (10th Cir. 1953) (holding that "the denial of [a] preliminary injunction [is] not an adjudication of the ultimate rights in controversy. It [is not] conclusive on the court or the rights of the plaintiffs at a subsequent hearing."). Moreover, even if this Court was to conclude that there was a final judgment with respect to R.S.'s parents' private school placement request in the 2014 litigation, that judgment would not necessarily bar the ALJ's consideration of private school placement as a prospective remedy in this case—where a distinct FAPE violation that has been found and new proceedings on the violation are underway.

The Court therefore finds that the ALJ erred in summarily dismissing Plaintiff's request that she consider private school placement as a potential remedy for Defendant's FAPE violation. However, for the following reasons, the Court, in its discretion, declines to remand the issue for reconsideration by the ALJ. Instead, the Court finds, based on the evidence and argument before it, that private school placement is not warranted as a remedy here.

Private school placement as an equitable remedy subject to the Court's discretion can take several forms.[6] *Burlington*, 471 U.S. at 369–70 (private school placement is an equitable remedy within the broad discretion of the court.) One form

---

[6] Of note, Plaintiff does not specify what type of school placement or funding he seeks, or what statute or legal authority governs his request. The original complaint in this matter simply states that "[R.S] is entitled to a proper private school placement." (Doc. # 27 at 3.) And Plaintiff's response to Defendant's request for summary judgment in this case (which included a discussion of this issue) did not address private school placement at all. (Doc. # 27 at 76–102.)

occurs when parents unilaterally change their child's placement to a private school during the pendency of IDEA proceedings. In such a case, the parents may be entitled to reimbursement "if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Carter*, 510 U.S. at 15; *see also Burlington*, 471 U.S. at 369. This form of reimbursement for private school placement is not applicable here because R.S.'s parents did not unilaterally change R.S.'s placement to a private school. They have not expended any money on tuition thus far and are not, at this time, requesting any tuition reimbursement for past-made payments.

Instead, Plaintiff's request can reasonably be understood only as a request for prospective placement reasonably intended as compensatory education. Although apparently less common, courts have ordered prospective placement under express or at least implicit treatment as compensatory education. *See Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1252 (10th Cir. 2009) (referring to private school placement funded by the school district as "compensatory-education payments."); *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1290 (11th Cir. 2008) (approving of a district court's award of compensatory education in form of placement at private school); *see also* Perry A. Zirkel, *Adjudicative Remedies for Denials of FAPE Under the IDEA*, 33 J. OF NAT'L ASS'N OF ADMIN. L. JUDICIARY 213, 225 n.49 (2013) (citing cases ordering educational placement as compensatory education).

As this Court has already concluded, the ALJ's decision not to award compensatory education services is supported by the record and not erroneous. It follows that an award of prospective private school placement as compensatory relief is

17

likewise unwarranted in this case. Indeed, "[t]he question of who must bear the financial responsibility for a private school placement turns upon [in part] . . . the inappropriateness of the alternative public school placements." *Davis v. D.C. Bd. of Ed.*, 530 F. Supp. 1209, 1212 (D.D.C. 1982). The IDEA encourages school districts to avoid "separate schooling or other removal . . . from the regular educational environment" unless a child's "regular" classes cannot meet his needs. 20 U.S.C. § 1412(5)(A); *see also, e.g., Burlington*, 471 U.S. at 369 (IDEA "contemplates that such education will be provided where possible in regular public schools, with the child participating as much as possible in the same activities as non-handicapped children, but the Act also provides for placement in private schools at public expense where this is not possible."); *Manchester Sch. Dist. v. Christopher B.*, 807 F. Supp. 860, 870 (D.N.H. 1992); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044 (5th Cir. 1989).

R.S.'s education at CMCA is meeting his educational needs. As thoroughly explained in Part IV above, he succeeded in virtually all subjects immediately following his return to school in October 2014 and has steadily progressed ever since. This Court sees no reason, nor has Plaintiff provided any meaningful argument, to support ordering the school district to fund an alternative placement to public school.

## VI. CONCLUSION

For the foregoing reasons, the Court:

1. REJECTS the Recommendation of United States Magistrate Judge Kathleen M. Tafoya (Doc. # 45);

2. SUSTAINS Defendant's Objections to the Recommendation (Doc. # 46); and

3. AFFIRMS the Final Agency Decision of the ALJ.

DATED: August 7, 2018

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge